UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TYREE WRIGHT,

            Plaintiff,

vs.                                    Case No. 3:17-cv-665-J-39JRK

S. ALVAREZ, et al.,

            Defendants.
_____

**ORDER**

## I. Status

On June 12, 2017, Plaintiff Tyree Wright, an inmate of the Florida Department of Corrections, filed a civil rights Complaint (Doc. 1) pursuant to 42 U.S.C. § 1983.  He is proceeding on an Amended Complaint (Amended Complaint) (Doc. 8).[1]  In its January 18, 2018 Order, the Court granted Defendants S. Alvarez, P. Enochs and R. Vivas, M.D.'s Motion to Dismiss the Medical Malpractice Claim (Doc. 27).  Order (Doc. 31).  The Court dismissed the medical malpractice claim with prejudice.  Id. at 6.  Defendants S. Alvarez, P. Enochs and R. Vivas, M.D.'s Amended Motion for Summary Judgment (Motion) (Doc. 43) is pending before the Court.[2]  Plaintiff filed a Response (Response) (Doc. 41) and his Declaration (Doc. 42).  See Summary Judgment Notices (Docs. 38 & 44).

_____

[1]  The Court references the page numbers assigned by the electronic filing system.

[2]  The Court hereinafter refers to the exhibits filed in support of the Motion as "Ex" (Doc. 36).

Plaintiff raises one claim, an Eighth Amendment claim of deliberate indifference to serious medical needs. Amended Complaint (Doc. 8-1 at 5). He claims Defendants have been deliberately indifferent to his serious medical needs, failing or refusing to obtain medical treatment for Plaintiff. Id. As relief, Plaintiff seeks declaratory relief as well as compensatory and punitive damages. Id. He also seeks costs and any additional relief that the Court deems just, proper, and adequate. Id. at 6.

Plaintiff alleges that while confined at Florida State Prison (FSP), from the end of 2013 to the beginning of 2015, the named Defendants were deliberately indifferent to his serious medical needs. Amended Complaint (Doc. 8 at 4-5). He contends this indifference resulted in a brain tumor which weakened the entire right side of Plaintiff's body and caused permanent disability. Id. at 5.

In brief, Plaintiff provides the following factual allegations.[3] In 2008, he was involved in a motorcycle accident, resulting in a craniotomy to relieve brain swelling. Amended Complaint (Doc. 8-1 at 2). Medical providers diagnosed him with

---

[3] See Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014) (per curiam) (citations omitted) ("The factual assertions that [Plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [Plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations."). See Amended Complaint (Doc. 8-1 at 6).

perceptive aphasia. _Id_. While incarcerated at FSP in the later part of November, 2013, Plaintiff began to experience debilitating headaches and dizziness. _Id_. Plaintiff complained to unnamed medical personnel, and they told him to write a sick call request. _Id_. Plaintiff put in a request for sick call referencing his symptoms of headaches and dizziness and his medical history of a head injury. _Id_. at 2-3. Medical personnel provided him with several packets of Ibuprofen. _Id_. at 3. Plaintiff wrote "request forms" asking medical personnel to retrieve medical records from Shands Jacksonville. _Id_. Plaintiff submitted sick call requests, and was provided Ibuprofen. _Id_.

By March of 2014, Plaintiff's right side was affected and this hindered his ability to work as a barber in the prison. _Id_. Plaintiff informed medical that the pain he was experiencing was in the location of the craniotomy, and he was experiencing problems with his equilibrium. _Id_. For months, Plaintiff wrote numerous requests, but was told to access sick call by Defendants Alvarez and Enochs, who observed Plaintiff's condition and laughed at his gait. _Id_. Plaintiff asked Alvarez and Enochs to obtain his medical records and requested a brain scan, and Alvarez and Enochs told Plaintiff to access sick call. _Id_.

After accessing sick call several times and being given Ibuprofen by medical staff, Plaintiff "finally put in to see a doctor." _Id_. On May 5, 2014, Dr. Vivas saw Plaintiff at the

Reception and Medical Center (RMC), and Dr. Vivas told Plaintiff to cease malingering. Id. Although Plaintiff was housed on the third floor, Defendants Alvarez and Enochs did not move Plaintiff. Id. Plaintiff continued to submit general requests and sick call requests and begged for treatment, but medical staff ignored him. Id. Either Defendant Alvarez and/or Defendant Enochs signature and stamp appeared on the denials of submissions or decisions to return without action. Id. at 3-4.

Plaintiff endured pain from November 20, 2013 until January 5, 2015, because Dr. Vivas refused to order a brain scan. Id. at 4. On March 20, 2015, a scan showed a tumor on Plaintiff's brain. Id. Plaintiff submits, "[d]ue to the negligence and nonchalant attitude" regarding Plaintiff's complaints, "Defendant Viva's procrastination in refusing to order a CAT-scan/MRI" allowed the tumor to grow and mature. Id. The advancement of the tumor caused debilitating headaches and dizziness and some change in Plaintiff's walking, but Plaintiff states this did not prevent the proper functioning of his motor skills. Id.

Presently, Plaintiff's motor skills and speech are diminished, and his entire right side is not functioning normally. Id. Plaintiff concludes:

> Had the listed defendants exercised due-diligence and ordered a brain scan and/or took the complaints seriously based on the totality of the circumstances and medical history made known and available to medical personel [sic] at F.S.P., the tumor that was given over 15

4

> months to advance, could have been discovered
> sooner, thus decreasing the lik[e]lihood of
> brain damage, severe pain, and permanent
> disability.

Id.

## II.  Summary Judgment Standard

"Summary judgment is appropriate only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>Moton v. Cowart</u>, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "If the moving party meets this burden, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" <u>Ekokotu v. Federal Exp. Corp.</u>, 408 F. App'x 331, 333 (11th Cir.) (per curiam) (quoting <u>Fickling v. United States</u>, 507 F.3d 1302, 1304 (11th Cir. 2007)), <u>cert</u>. <u>denied</u>, 565 U.S. 944 (2011).

## III.  Defendants' Motion

Defendants submit that they are entitled to summary judgment with respect to this Eighth Amendment claim of deliberate indifference to a serious medical need.[4]  Amended Motion at 12. They concede that a brain tumor is a serious medical need, but they aver that there is no evidence that it was present before March

---

[4] At the time of the events alleged in the Amended Complaint, Defendant Alvarez was the Health Services Administrator for Corizon Health, Inc. (Corizon).  Defendant Enochs was a licensed practical nurse (LPN) employed by Corizon at FSP, and Defendant Vivas, a physician employed by Corizon at FSP.  Ex. 1; Ex. 2 (Doc. 39, executed Ex. 2); Ex. 3.

2015.  Id. at 11.  Also, they submit there is no evidence that the Defendants drew the conclusion that a tumor existed prior to March, 2015.  With regard to Defendant Alvarez, a non-medical professional, and Defendant Enochs, these Defendants contend not only are they not qualified to make medical diagnoses, they are incapable of doing so.  Id.

Moreover, Defendants assert they did not ignore Plaintiff's medical condition and responded to Plaintiff's sick call requests. Id.  They aver that the treatment was successful, as Plaintiff reported his symptoms subsided with treatment.  Id.  The nurse practitioner and Dr. Vivas recognized Plaintiff's changed condition and immediately referred Plaintiff to a specialist, resulting in successful surgery for a brain tumor.  Id.  Finally, Defendants contend there is no evidence delay caused additional harm as Plaintiff had a brain tumor, which must be surgically removed, and Plaintiff has submitted no evidence that an earlier diagnosis would have changed the outcome.  Id. at 11-12.

After reviewing Plaintiff's medical records, Dr. Vivas, in his sworn Affidavit of Rodrigo Vivas, M.D.  Ex. 3 (Doc. 36-3), provided a summary of his interactions with Plaintiff.  Defendant Vivas states the first interaction occurred on May 5, 2014, when Plaintiff was seen for a complaint for hearing loss, and it was determined he had an ear wax plug and was provided with drops for ten days.  Id. (Doc. 36-3 at 1-2).  Defendant Vivas' second

interaction with Plaintiff occurred on July 11, 2014, when Plaintiff complained of equilibrium problems, and the doctor noted Plaintiff's history of head trauma and performed a physical and neurological examination. Id. at 2. The results were normal. Id. Dr. Vivas found no gross motor and sensitivity deficit, a condition contrary to any active brain injury. Id. In response to Plaintiff's medical concerns, Dr. Vivas ordered Antivert, a medication to combat dizziness, and Naproxen, a pain medication. Id.

Dr. Vivas' third interaction with Plaintiff occurred on November 17, 2014, when a registered nurse referred Plaintiff to Dr. Vivas. Id. Plaintiff complained of headaches, and Dr. Vivas conducted a physical examination. Id. The results were negative for Romberg (a test for balance issues) or nygstamus (a neurologic eye test). Again, there was no gross motor and sensitive deficit. Id. Dr. Vivas ordered a test for syphilis to rule out any infection of the central nervous system. Id. Dr. Vivas prescribed Ibuprofen and ordered a follow up appointment. Id.

Dr. Vivas' fourth interaction with Plaintiff occurred on December 12, 2014, a follow up appointment for headaches. Id. Dr. Vivas found Plaintiff's blood pressure high (140/100), which can cause both headaches and dizziness. Id. Plaintiff did not complain of vomiting or hearing issues. Id. Dr. Vivas conducted a physical examination showing nygstamus positive results on a test

of the central nervous system. Id. at 3. Dr. Vivas found Plaintiff's strength and ROT normal. Id. Dr. Vivas ordered Antivert and Pain Off tablets. Id. He directed a follow up appointment in two weeks to observe any changes. Id.

The fifth interaction with Plaintiff occurred on January 5, 2015, as a follow up to the complaints of headaches and dizziness. Id. Plaintiff related that he was doing well on the medication, but when he did not have it, the symptoms returned. Id. Plaintiff denied other symptoms. Id. Plaintiff's blood pressure remained high. Id. Dr. Vivas prescribed HCTZ for hypertension, and directed the provision of daily aspirin and Plaintiff's enrollment in the cardiovascular clinic. Id. Dr. Vivas also ordered blood work. Id.

The sixth interaction concerning Plaintiff occurred on March 2, 2015, after Plaintiff was seen by ARNP (Nurse Practitioner) Varghese concerning Plaintiff's complaints of dizziness without headaches. Id. Plaintiff reported medications were not working and his symptoms had worsened.[5] Id. Dr. Vivas discussed Plaintiff's case and medical history with ARNP Varghese. Id. Dr. Vivas and ARNP Varghese ordered a CT scan of Plaintiff's brain. Id. Thereafter, on March 13, 2015, Plaintiff had the CT scan. Id. It showed a mass in the brain. Id. On March 16, 2015, Dr. Vivas

---

[5] Dr. Vivas opines that Plaintiff's neurologic condition remained stable on medication until March 2, 2015, and when his condition changed, so did his treatment. Ex. 3 (Doc. 36-3 at 4).

ordered a STAT brain MRI and neurosurgery consultation. Id. Dr. Vivas changed Plaintiff's health care grade and provided Plaintiff with a wheelchair pass. Id. Plaintiff's transfer to RMC occurred the following day, on March 17, 2015. Id. at 3-4. Dr. Vivas routinely conducted chart reviews, primarily concerning Plaintiff's high blood pressure issues. Id. at 4.

Stephanie Alvarez states that her position as Health Services Administrator for Corizon Health, Inc., is purely administrative, and she holds no license to provide medical care. Affidavit of Stephanie Alvarez, Ex. 1 (Doc. 36-1 at 1). As a health care administrator, she responded to grievances in which she informed Plaintiff of the proper procedure for obtaining medical care through the sick call procedure at FSP. Id. at 1-2. Additionally, on March 16, 2015, Defendant Alvarez wrote an incidental note referencing the doctor's emergency request for an MRI and a consultation with a neurologist. Id. at 2. Plaintiff's transfer to RMC for additional treatment occurred the following day. Id.

Patsy Enochs, LPN, submitted the Affidavit of Patsy Enochs, LPN, Ex. 2 (Doc. 39-1). The affiant states, as a licensed practical nurse, she "cannot diagnose or prescribe treatment for any medical condition." Id. at 1. She responded to Plaintiff's inmates requests, and she explained these types of requests were not to be used to access medical care as the proper procedure at FSP is the sick call procedure. Id. at 2. She repeatedly advised

Plaintiff to use the sick call procedure. Id. Finally, Defendant Enochs entered an incidental notation on February 9, 2015 that Plaintiff's EKG was normal, and she entered an incidental notation on March 13, 2015 that Plaintiff returned from RMC with no complaints. Id.

## IV. Plaintiff's Response

Plaintiff, in his Response, states Defendants were deliberately indifferent to his serious medical needs as evidenced by the medical records. Response at 1-2. Plaintiff contends Defendants should have provided treatment for his serious medical needs or referred Plaintiff to a doctor or a hospital for more experienced and knowledgeable treatment. Id.

Although Plaintiff submitted a Declaration (Doc. 42), it is unsworn and does not meet the requirements of 28 U.S.C. § 1746 (Unsworn declarations under penalty of perjury) and will not be considered by the Court; however, as noted previously, Plaintiff's Amended Complaint meets Rule 56's requirements for affidavits and sworn declarations.

## V. The Eighth Amendment

The Eighth Amendment is interpreted as prohibiting deliberate indifference to serious medical needs of prisoners. Estelle v. Gamble, 429 U.S. 97, 102 (1976). More particularly,

> The Eighth Amendment's prohibition against "cruel and unusual punishments" protects a prisoner from "deliberate indifference to serious medical needs."

> *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct.
> 285, 50 L.Ed.2d 251 (1976).  To state a claim
> of unconstitutionally inadequate medical
> treatment, a prisoner must establish "an
> objectively serious [medical] need, an
> objectively insufficient response to that
> need, subjective awareness of facts signaling
> the need, and an actual inference of required
> action from those facts."  *Taylor v. Adams*,
> 221 F.3d 1254, 1258 (11th Cir. 2000).

*Kuhne v. Fla. Dep't of Corr.*, 745 F.3d 1091, 1094 (11th Cir. 2014).

"A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'  In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002)).

To demonstrate deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry.  *See Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (citation omitted).  To establish deliberate indifference to a serious medical need, Plaintiff must shoulder three burdens; he must satisfy the objective component (showing he had a serious medical need), the subjective component (showing the official acted with deliberate indifference to his serious medical need), and causation (showing the injury was caused by the Defendant's

11

wrongful conduct). Mann, 588 F.3d at 1306-07. In order to prove the subjective component, a plaintiff is required to demonstrate: (1) the official's subjective knowledge of a risk of serious harm; (2) the official's disregard of that risk; (3) by conduct that is more than **mere negligence**.[6] Daniels v. Jacobs, No. 17-14429, 2018 WL 4998130, at *8 (11th Cir. Oct. 16, 2018) (per curiam) (emphasis added). See Nam Dang, by and through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1280 (11th Cir. 2017) (finding a pretrial detainee must prove these three factors to establish deliberate indifference); McLeod v. Sec'y, Fla. Dep't of Corr., 679 F. App'x 840, 843 (11th Cir. 2017) (per curiam) (same for a state prisoner).

A plaintiff must demonstrate that a defendant's responses to his medical needs were poor enough to constitute an unnecessary and

---

[6] In reaction to Defendants' assertion that the third burden of the subjective component requires a showing of conduct that is more than gross negligence, see Amended Motion at 10, the Court emphasizes that the standard is one of more than mere negligence. Although the Eleventh Circuit has, at times, referred to the standard as being one of more than gross negligence, the Eleventh Circuit recently clarified its position that the standard in McElligott v. Foley, 182 F.3d 1248, 1255-59 (11th Cir. 1999) (employing the "more than mere negligence" standard) is the appropriate one, as it is more consistent with Farmer v. Brennan, 511 U.S. 825, 847 (1994), and McElligott is the first Eleventh Circuit case, following Farmer, to address the question of degree of culpability pursuant to Farmer and consequently must be followed. Melton v. Abston, 841 F.3d 1207, 1223 n.2 (11th Cir. 2016) (per curiam). Relying on McElligott and heeding the Eleventh Circuit's repeated admonitions to follow McElligott, the Court will employ the "more than mere negligence" standard in this opinion.

wanton infliction of pain, and not merely accidental inadequacy, negligence in treatment, or even medical malpractice actionable under state law. <u>Taylor v. Adams</u>, 221 F.3d 1254, 1258 (11th Cir. 2000) (citing <u>Estelle</u>, 429 U.S. at 105-106), <u>cert</u>. <u>denied</u>, 531 U.S. 1077 (2001). It is important to recognize,

> "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." <u>Mandel v. Doe</u>, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted). However, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Rogers v. Evans</u>, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

<u>Nam Dang, by and through Vina Dang</u>, 871 F.3d at 1280.

In the prison context, the Court has to distinguish between matters of professional medical judgment and evidence of disputed facts. <u>Beard v. Banks</u>, 548 U.S. 521, 530 (2006). If it is a matter of professional judgment, for example a decision not to pursue a particular course of diagnosis or treatment, it does not represent cruel and unusual punishment. <u>Estelle</u>, 429 U.S. at 107-108. Moreover, a dispute over adequacy of treatment sounds in tort law, not constitutional law. In order to show a deprivation of a constitutional dimension based on any delay in providing medical treatment, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." <u>Hill</u>, 40 F.3d at 1187-88.

## VI. Findings of Fact and Conclusions of Law

The Court finds Plaintiff has satisfied the requirement that he has an objectively serious medical need. In their Amended Motion, Defendants contest Plaintiff's assertion of deliberate indifference to that need.

The medical record demonstrates, in pertinent part, the following with regard to Defendant Vivas and his interactions with Plaintiff. On May 5, 2014, Dr. Vivas prescribed ear drops for an ear wax plug upon a complaint for hearing loss. Ex. 4 (Doc. 36-5 at 46). In July, 2014, upon Plaintiff's complaint of equilibrium and dizziness issues, Dr. Vivas prescribed Antivert for dizziness and Naproxen for pain. Id. at 47. On November 13, 2014, Nurse T. Davis saw Plaintiff for Neurological Changes/Deficits Protocol. Id. at 40. Plaintiff again complained of dizziness. Id. The nurse performed a functions check, looking for a symmetrical smile, the strength of grip, arm drift, and for slurring of speech. Id. Plaintiff exhibited a weaker grip, but no other deficits. Id. The nurse provided Ibuprofen and referred Plaintiff for a doctor's appointment. Id. at 41. On November 17, 2014, Dr. Vivas saw Plaintiff for complaints of headaches and dizziness. Id. at 39. Dr. Vivas conducted a physical examination, finding no gross motor and sensitive deficit after conducting neurologic and balance tests. Id. In order to rule out an infection of the nervous system, Dr. Vivas ordered a syphilis test. Id. Dr. Vivas

14

prescribed Ibuprofen and ordered a follow up with Plaintiff.  Id.

The next month, on December 12, 2014, Dr. Vivas saw Plaintiff for his follow up appointment concerning his headache/dizziness complaints and conducted a physical examination of Plaintiff.  Id. at 36.  At this appointment, Plaintiff exhibited high blood pressure and tested positive for the nygstamus test (neurologic eye test).  Id.  Plaintiff's strength and ROT were found to be normal. Id.  Dr. Vivas prescribed Antivert and Pain Off and ordered another follow up appointment.  Id.

On January 5, 2015, at the follow up appointment for headaches and dizziness, Plaintiff told Dr. Vivas he was doing well on the medications, but did poorly when he was off the medications.  Id. at 34.  Plaintiff denied suffering any other symptoms.  Id.  Dr. Vivas found Plaintiff's blood pressure remained high, so he prescribed medication for hypertension and directed Plaintiff be provided with daily aspirin and enrolled in the cardiovascular clinic.  Id.  Dr. Vivas also ordered blood work and prescribed Pain Off.  Id.  Plaintiff continued to receive Antivert.  Id. at 66.

In February, an EKG exhibited normal results.  Id. at 33. Plaintiff had an x-ray of the skull on February 9, 2015.  Id. at 33-34.  Dr. Vivas referenced Plaintiff's prior surgery to the skull.  Id. at 34.  On February 12, 2015. Dr. Vivas noted the results of the x-ray were normal.  Id. at 32.  On February 20,

2015, Dr. Vivas scheduled a follow up appointment in the clinic for Plaintiff on March 2, 2015. <u>Id</u>.

On March 2, 2015, ARNP Varghese saw Plaintiff for his follow up vertigo appointment. <u>Id</u>. at 31. Plaintiff complained of dizziness and the medication not working at all. <u>Id</u>. Plaintiff complained his medical problems were getting worse. <u>Id</u>. ARNP Varghese noted Plaintiff is Bipolar and suffers from depression and anxiety and hears voices. <u>Id</u>. ARNP Varghese further noted Plaintiff's unsteady gait and dizziness. <u>Id</u>. After a discussion with Dr. Vivas, Dr. Vivas and ARNP Varghese ordered a CT scan of the brain. <u>Id</u>. On March 13, 2015, Plaintiff went to RMC for a CT scan of the head/brain. <u>Id</u>. at 29. The brain scan showed a mass, and on March 16, 2015, Dr. Vivas ordered a STAT brain MRI and neurosurgery consultation.[7] <u>Id</u>. at 28. Dr. Vivas directed a change in Plaintiff's health care profile and provided Plaintiff with a wheel chair pass. <u>Id</u>. On that day, Defendant Alvarez processed the emergency request for a MRI and neurosurgeon consultation. <u>Id</u>. at 27.

Dr. Vivas issued a permanent wheel chair pass and referred Plaintiff for mental health treatment for anxiety and depression. <u>Id</u>. at 23-24. On March 17, 2015, Plaintiff transferred to RMC. <u>Id</u>. at 21-22.

---

[7] Notably, on March 16, 2015, when Plaintiff got up to get his mail, he felt dizzy, fell and hit his head. Ex. 4 (Doc. 36-5 at 25-26).

At Memorial Hospital, several consultations took place. Dr. Hernan R. Chang provided a consultation for Plaintiff concerning an intracranial mass. Ex. 4 (Doc. 36-4 at 87-88). Dr. Chang noted Plaintiff's past medical history includes hypertension, psychiatric illness, and seizure disorder. <u>Id</u>. at 87. His surgical history includes a craniotomy and left knee surgery post multiple gunshot wounds. <u>Id</u>. On March 19, 2015, Dr. Daniel B. Groblewski provided a consultation for Plaintiff concerning seizures and brain mass. <u>Id</u>. at 81-82. Dr. Groblewski noted Plaintiff's increasing headaches over the months, eventually with visual disturbance. <u>Id</u>. at 82. Dr. Groblewski stated that a recent CT showed a posterior fossa mass, now confirmed by an MRI. <u>Id</u>. He also recorded a history of a gunshot wound to the head in 2008. <u>Id</u>.

Dr. Michael Munz, on March 19, 2015, provided a consultation for Plaintiff concerning a brain mass. <u>Id</u>. at 78-79. Dr. Munz noted a history of a craniectomy in April 2008, after a gunshot wound to the head. <u>Id</u>. at 78. Dr. Munz suggested a vetriculostomy followed by a posterior fossa craniotomy for removal of the tumor. <u>Id</u>. at 79. Dr. Bruce P. Krieger, on March 19, 2015, provided a consultation concerning Plaintiff's acute large brain tumor with change in sensorium and speech. <u>Id</u>. at 76-77. Dr. Krieger's history noted patient had severe headaches over the last several days and was seen in the infirmary. <u>Id</u>. at 76. Plaintiff exhibited mild dysarthric speech. <u>Id</u>. Dr. Krieger found Plaintiff

to have deficits of dysarthric speech and an unsteady gait with frequent falls. Id. at 77. Finally, on March 20, 2015, Dr. Emad Naem provided a consultation for Plaintiff concerning elevated TSH. Id. at 83-84. A review of systems showed headaches, mild nausea, dry mouth, and blurry vision. Id. at 83. Dr. Naem too noted a surgical history of craniotomy post gunshot wound to the head. Id.

Plaintiff's craniotomy for removal of the meningioma, posterior fossa craniotomy with tumor resection took place on March 30, 2015. Id. at 65-66. On April 6, 2015, Plaintiff was discharged. Id. at 72-73.

Upon review of the medical records, the Court concludes Dr. Vivas assessed and reassessed Plaintiff's health and adopted alternative treatment plans and medication as Plaintiff's symptoms changed over time. Dr. Vivas saw Plaintiff on a regular basis for numerous ailments, including a hearing issue, equilibrium and dizziness issues, headaches, and hypertension. Dr. Vivas made frequent medical assessments, including neurological assessments; he ordered a syphilis test; and he prescribed medications to alleviate pain and to reduce dizziness and tackle hypertension. He conducted physical examinations, including neurological tests. Of import, both an EKG and an x-ray of the skull taken in February were normal.

In March, when Plaintiff complained of his medication no longer working and medical staff recorded Plaintiff's unsteady gait

and continued dizziness, Dr. Vivas ordered a CT scan of the brain, after conferring with staff.  This scan showed a brain mass, and Dr. Vivas immediately ordered a brain MRI, a neurosurgery consultation, a wheel chair pass, and a change in health care profile.

Based on these medical records, Dr. Vivas and the supporting medical staff at FSP made extensive efforts to address Plaintiff's ailments and to try to determine the cause of the symptoms he exhibited.  Dr. Vivas did not take the easier and less efficacious route to do so.  He ordered tests and other medical procedures to try to find the source of the symptoms and prescribed medications to ease Plaintiff's symptoms and pain.  The record demonstrates that Plaintiff's previous medical history includes multiple gunshot wounds, brain injury, brain surgery, a seizure disorder, and hypertension, making efforts to determine the source of his symptoms all the more difficult.[8]  The record shows Plaintiff has mental health concerns, including delusions/hallucinations, anxiety, and depression, further complicating the assessment and management of his health care needs.

The medical record shows that as Plaintiff's ailments, symptoms, and complaints changed, Dr. Vivas reassessed Plaintiff's

---

[8] "There can be no doubt that controlling seizures constitutes a serious medical need[.]"  Hilyer v. Dunn, No. CV 15-00356-WS-N, 2016 WL 7093437, at *4 (S.D. Ala. Oct. 28, 2016), report and recommendation adopted by No. CV 15-00356-WS-N, 2016 WL 7045731 (S.D. Ala. Dec. 2, 2016).

condition and prescribed medications to treat the ailments and pain. He conducted and ordered various tests to try to find the source of Plaintiff's ailments, even ordering a syphilis test to rule out a neurological infection. As Plaintiff's symptoms worsened and deficits appeared, Dr. Vivas responded accordingly, directing Plaintiff to a cardiovascular clinic, ordering an EKG and x-rays, and then a CT scan. Of import, the x-ray taken of Plaintiff's skull in February 2015 was normal. Shortly thereafter, the CT scan taken in March 2015 showed a mass in the brain.

Although Plaintiff has shown a serious medical need, he "cannot establish the subjective component of his deliberate indifference claim" because there is "no evidence that [Dr. Vivas] disregarded [Plaintiff's] severe pain." <u>Ruley v. Corr. Corp. of Am.</u>, No. 11-36-ART, 2013 WL 1815039, at *3 (E.D. Ky. Apr. 29, 2013). In fact, Dr. Vivas prescribed pain medication and other medication to relieve Plaintiff's symptoms and repeatedly attempted to find the source or sources of Plaintiff's ailments.

Based on the record before the Court and the supporting affidavits, Plaintiff's medical treatment certainly cannot be described as cursory. Although Plaintiff may believe a CT scan or an MRI or other procedures should have been done at an earlier period, a medical decision not to order a CT scan or MRI, or like measures, does not constitute cruel and unusual punishment under the Eighth Amendment. <u>Estelle</u>, 429 U.S. at 104; <u>Belford v.</u>

<u>Gonzalez</u>, No. 3:15-CV-878-J-34PDB, 2016 WL 1732632, at *2 (M.D. Fla. May 2, 2016) (recognizing the question as to whether a doctor should have employed additional diagnostic techniques or treatment is a classic example of a matter of medical judgment and not an Eighth Amendment violation).  <u>See</u> <u>Adams v. Poag</u>, 61 F.3d 1537, 1545 (11th Cir. 1995).  At most, Plaintiff has presented a claim of negligence or medical malpractice.[9]  <u>See</u> <u>Granda v. Schulman</u>, 372 F. App'x 79, 83 (11th Cir. 2010) (per curiam) (discussing <u>Estelle</u> and its holding, and distinguishing medical malpractice from an Eighth Amendment violation).  In this regard,

> Our courts have long recognized the government has an obligation to provide medical care for those it has incarcerated and that inmates must necessarily rely on prison authorities to meet their medical needs as those needs arise. <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976). Therefore, a government official's deliberate indifference to the serious medical needs of a prisoner violates the Eighth Amendment and is compensable under § 1983. <u>Id</u>. at 104. However, medical treatment of prisoners violates the Eighth Amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting <u>Rogers v. Evans</u>, 792 F.2d 1052, 1058 (11th Cir. 1991)) (internal quotations omitted). The conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to violate the Eighth Amendment. <u>Estelle</u>, 429 U.S. at 102. Therefore, negligent diagnosis or

---

[9] As noted previously, the Court dismissed the medical malpractice claim with prejudice.  Order (Doc. 31).

> treatment of a medical condition does not
> constitute a wrong under the Eighth Amendment.
> Id. at 106; see also McElligot v. Foley, 182
> F.3d 1248 (11th Cir. 1999). Likewise, a mere
> difference of opinion between an inmate and
> the prison medical staff as to treatment or
> diagnosis will not, alone, give rise to a
> cause of action under the Eighth Amendment.
> Harris, 941 F.2d at 1505.

Johnson v. Skoog, No. 5:14-CV-1217-RDP-JHE, 2017 WL 3262265, at *5

(N.D. Ala. July 12, 2017), report and recommendation adopted by No.

5:14-CV-1217-RDP-JHE, 2017 WL 3243667 (N.D. Ala. July 31, 2017),

aff'd, 727 F. App'x 647 (11th Cir. 2018).

    To the extent Plaintiff is complaining that he should have

received stronger pain medication for his frequent headaches, he

has not supported a claim of constitutional dimension and once

again his claim sounds in negligence:

> "[W]hen a prison inmate has received
> medical care, courts hesitate to find an
> Eighth Amendment violation." Waldrop v. Evans,
> 871 F.2d 1030, 1033 (11th Cir. 1999). "Whether
> and how pain associated with medical treatment
> should be mitigated is for doctors to decide
> free from judicial interference, except in the
> most extreme situations." Snipes v. DeTella,
> 95 F.3d 586, 592 (7th Cir. 1996). Ordinarily,
> the "failure to administer stronger
> medication" is a "medical judgment" that is
> not an appropriate basis for imposing
> liability. Adams v. Poag, 61 F.3d 1537, 1547
> (11th Cir. 1995)

O'Brien v. Seay, No. 5:04cv228-SPM/EMT, 2007 WL 788457, at *4 (N.

D. Fla. Mar. 3, 2007).

    Even assuming Plaintiff's treatment were to be considered less

than adequate or medical malpractice, "[a]ccidents, mistakes,

negligence, and medical malpractice are not 'constitutional violation[s] merely because the victim is a prisoner.'" <u>Harris v. Coweta Cty.</u>, 21 F.3d 388, 393 (11th Cir. 1994) (citing <u>Estelle</u>, 429 U.S. at 106). To the extent Plaintiff is claiming he should have received different tests and stronger medication, the record shows the treatment and medication he received does not amount to deliberate indifference to a serious medical need. Defendant Vivas, through the documentary evidence, has met his burden of showing there is no genuine issue of fact concerning whether he was deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff alleges Defendant Enochs, an LPN, failed to obtain Plaintiff's medical records, to provide Plaintiff with a brain scan, or move him from the third floor of the prison. Upon review of the medical records and the Affidavit of Defendant Enoch, she was not a doctor or a Registered Nurse. As an LPN, she could not prescribe medication or treatment or diagnose Plaintiff's condition. She explains her role with respect to her interactions with Plaintiff was limited to recording incidental notations in the medical record and responding to inmate requests.

The record reveals Defendant Enochs routinely processed Plaintiff's inmate requests, and in doing so, she told Plaintiff, who was seeking medical care or other relief related to his medical condition, to use the sick call procedure to obtain relief or care

from medical staff.[10]  The record shows that when Plaintiff properly utilized the sick call process, his requests were processed and addressed, although he may not have been satisfied with the responses of medical staff.

The record further demonstrates Defendant Enochs did not obstruct Plaintiff's treatment for his ailments.  Plaintiff was frequently seen for his ailments, and although his ailments proved difficult to diagnose, treat and resolve, the record shows the medical staff at FSP were not deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff has not demonstrated that Defendant Enochs had any control over housing assignments at FSP.  Since, as an LPN, she could not diagnose Plaintiff's medical condition or prescribe treatment, it follows she would not have the authority to issue a medical pass concerning Plaintiff's housing assignment, an accommodation like a wheel chair pass, left to the judgment of a treating doctor or comparable medical authority.  Also, as part of the medical staff, Defendant Enochs would not make security/housing decisions at FSP, a maximum security institution.

---

[10] The medical records show Defendant Enochs frequently told Plaintiff to access sick call.  Ex. 4 (Doc. 36-4 at 91, 92, 97, 101; Doc. 36-7 at 24).  Otherwise, she responded to questions or provided Plaintiff with pertinent information, like a particular medication that had been ordered by the physician or confirmation or notice of an upcoming medical appointment.  (Doc. 36-4 at 94, 96, 99, 102, 105).  See also Plaintiff's Exhibits (Doc. 29).

Plaintiff raises similar allegations against Defendant Alvarez. The record shows Defendant Alvarez was an administrator, not a licensed, medical professional. She too wrote incidental notes on medical records. She clearly did not make medical decisions as to Plaintiff's care and treatment at FSP, as that was left to the medical professionals. She responded to grievances, and like Defendant Enochs, repeatedly advised Plaintiff that he must utilize the sick call procedure to access medical care at FSP. Ex. 4 (Doc. 36-4 at 110). For example, she told Plaintiff that if he was still having problems with equilibrium, he needed to access sick call to be re-evaluated and referred to the appropriate medical provider for further evaluation if found medically indicated. <u>Id</u>. at 111. <u>See</u> <u>also</u> Plaintiff's Exhibits 6, 7, 9 (Doc. 29).

These responses do not exhibit deliberate indifference. Again, Defendant Alvarez is not a medical professional. Her role is limited to being an administrator, processing grievances or making notations on records, not providing medical care.

Insofar as Plaintiff alleges that his grievances and complaints were mishandled or improperly denied by Defendants Enochs and Alvarez, such a claim does not support a § 1983 action:

> Moreover, this Court agrees that [the defendant] may not be held liable on the theory of respondeat superior or on the basis that he approved the denial of Plaintiff's formal grievance. <u>See</u> <u>Larson v. Meek</u>, 240 F. App'x 777, 780 (10th Cir. 2007) ("Nothing in

either the original complaint or the amended complaint indicates any action or omission by [defendant] beyond his denial of [Plaintiff]'s grievances. [Defendant]'s denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations") (citation omitted); Baker v. Rexroad, 159 F. App'x 61, 62 (11th Cir. 2005) (per curiam) ("Because the failure of [the defendants] to take corrective action upon the filing of [the plaintiff]'s administrative appeal at the institutional level did not amount to a violation of due process, the district court properly determined that [the plaintiff] failed to state a claim under § 1983"); Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) (finding that prison officials who were not involved in an inmate's termination from his commissary job, and whose only roles involved the denial of administrative grievances or the failure to act, were not liable under § 1983 on a theory that the failure to act constituted an acquiescence in the unconstitutional conduct).

Nicely v. Lagman, 3:12-CV-1300-J-32JBT, 2014 WL 3721266, at *4 (M.D. Fla. July 28, 2014).

In conclusion, Plaintiff has failed to shoulder the burden of the subjective component, showing the Defendants acted with deliberate indifference to his serious medical needs or satisfy the causation component, as he has not shown his injury was caused by Defendants' wrongful conduct. Although the Court sympathizes with Plaintiff's plight, as he has demonstrated a very serious medical need, the public interest is not served by forcing physicians to act outside their professional, medical judgment. Plaintiff has failed to demonstrate the responses to his medical needs were poor

enough to constitute an unnecessary and wanton infliction of pain. On the contrary, the record shows the medical staff's responses did not constitute an objectively insufficient response to Plaintiff's needs or conduct constituting more than mere negligence. The treatment provided by the medical care providers at FSP was not so grossly incompetent, inadequate, or excessive as to shock the conscience or to be considered intolerable to fundamental fairness. Thus, the Motion is due to be granted and judgment will be entered for the Defendants.

Therefore, it is now

**ORDERED:**

1. Defendants S. Alvarez, P. Enochs and R. Vivas, M.D.'s Amended Motion for Summary Judgment (Doc. 43) is **GRANTED**, and the **Clerk** shall enter judgment for Defendants S. Alvarez, P. Enochs and R. Vivas, M.D., and against Plaintiff Tyree Wright.

2. The **Clerk** shall terminate all pending motions, enter judgment accordingly, and close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 16th day of November, 2018.

_____
BRIAN J. DAVIS
United States District Judge

sa 11/13
c:
Tyree Wright
Counsel of Record